STATE, EX REL. WESTERN CONSTRUCTION COMPANY,
v. BOARD OF COMMISSIONERS OF THE COUNTY
OF CLINTON.

[No. 20,589.   Filed February 21, 1906.]

1. PLEADING. — Complaint. — Judgment. — Res Judicata.—Court
Records.—Judicial Notice.—Appeal and Error.—Where plaintiff
in its complaint relies upon a decision of the Supreme Court as
res judicata as to the question involved, the Supreme Court has
the right to examine the entire record of such cause to see what
was really adjudicated, especially where such decision is am-
biguous.   p. 171.

2. SAME.—Judicial Records.—Obligation.—Parties are bound by
the records under which they claim, and it is not necessary to
allege what is apparent or arises by. necessary implication there-
from.   p. 172.

3. RAILROADS. — Aid.—Statutes.—Taxation.—Mandamus.—Under
the act of 1869 (Acts 1869 [s. s.], p. 92, §12) the fund raised
by the special levy provided therein for the payment of railroad
subsidies is the primary fund from which such subsidies are
payable, and mandamus lies to compel the proper officials to levy
the tax provided. State, ex rel., v. Board, etc., 162 Ind. 580,
disapproved.   p. 175.

4. WORDS AND PHRASES.—"Appropriations."—Railroads.—Subsi-
dies.—Statutes.—The word "appropriation" as used in the
statutes (Acts 1869 [s. s.], p. 92, and Acts 1875 [s. s.], p. 70)
includes usually both the taking of stock in, and the granting of
a bonus to, the railroad company.   p. 177.

5. SAME. — "Subscription."—Railroads.—Subsidies.—Statutes.—
The word "subscription" as used in §17 of the act of 1869 (Acts
1869 [s. s.], p. 92), postponing the rights of railroad companies
in appropriations until after a "subscription" is made, means a
formal written promise.   p. 177.

6. STATUTES.—Construction.—Railroads.—Subsidies.—Section 17
of the act of 1869 (Acts 1869 [s. s.], p. 92), providing for the
payment of money by counties and townships as an aid in the
building of railroads, applies to donations.   p. 178.

7. SAME. — Construction. — Railroads. — Subsidies. — Conditions
Precedent.—Railroad companies have no right under §14 of the
act of 1869 (Acts 1869 [s. s.], p. 92) to demand any funds for
the purpose of aiding in the building of a railroad until the
board has made a donation thereof, which can be done only after
it has been collected.   p. 178.

State, *ex rel., v.* Board, etc.—166 Ind. 162.

8. STATUTES.—*Construction.—Railroads.—Subsidies.—Boards of Commissioners.—Refusal to Grant.—Remedy.*—Under the provisions of the act of 1869 (Acts 1869 [s. s.], p. 92) as amended by the act of 1875 (Acts 1875 [s. s.], p. 70) the right to compel a board of commissioners who refused to make a donation voted, levied and collected to aid in the building of a railroad, was lodged in the petitioners for such aid or the taxpayers of the township voting such aid. p. 178.

9. SAME.—*Construction.—Railroads.—Subsidies.—When Right to, Attaches.—Constitutional Law.*—The legislature presumably intended in the act of 1869 (Acts 1869 [s. s.], p. 92) not to give railroad companies any right to money levied and collected by counties for their aid until the boards of commissioners made the appropriation thereof, since the Constitution (Art. 10, §6) forbids the appropriation of money by such boards, for such purposes, unless the same be paid at the time; and since the same language is' used in reference to townships, the same presumption prevails as to their appropriations. p. 179.

10. SAME. — *Construction.—Railroads.—Subsidies.—When Legal Right to, Attaches.*—Railroad companies have no legal rights to subsidies levied and collected for their aid by townships under the act of 1869 (Acts 1869 [s. s.], p. 92) until an appropriation thereof is made by the proper board of commissioners. p. 180.

11. CONTRACTS.—*Conditions Precedent.—Railroads.—Subsidies.*—The fact that a railroad company performs all of the conditions requisite for receiving a subsidy, as provided by the act of 1869 (Acts 1869 [s. s.], p. 92), does not constitute a contract though the county or township has voted for, levied and collected such subsidy. p. 186.

12. WORDS AND PHRASES.—*"Donation."*—"Donation" signifies the act by which the owner of a thing transfers its title and possession to another without the receipt of any consideration therefor. p. 187.

13. STATUTES. — *Construction. — Amendments.—Presumptions.*—Where the legislature substantially reënacts a statute the presumption is that it did so in view of the interpretation given to such former statute. p. 188.

14. SAME.—*Amendments.—How Considered.*—A statute amending a former act operates, as to matters thereafter occurring, as if the amendments had been incorporated in the original act. p. 189.

15. SAME.—*Amendments.—Construction.—Railroads.—Subsidies.*—The act of 1875 (Acts 1875 [s. s.], p. 70), being an amendment of the act of 1869 (Acts 1869 [s. s.], p. 92), is governed

by the same rules of construction as the original act as to the legal rights of railroad companies to subsidies voted for their aid by townships, the omission of appropriations by counties being ineffective to change the construction of the later act. p. 189.

16. STATUTES.—*Amendments.*—*Construction.*—*Railroads.*—*Subsidies.*—*Right to.*—Under the act of 1875 (Acts 1875, p. 121, §5369 Burns 1901), amending §2 of the act of 1873 (Acts 1873, p. 184), which is supplementary to the act of 1869 (Acts 1869 [s. s.], p. 92), railroad companies have no legal right to subsidies voted, levied and collected for their aid, until an appropriation thereof has been made by the board of commissioners, since by said act of 1875, §§14 and 17 of the act of 1869, *supra*, were left in full force, and since §17 of said act of 1869, giving a petitioner or taxpayer of the township the right to mandate such board in case of refusal, was substantially reënacted six days after said act of 1875, *supra*, in the act of 1875 (Acts 1875 ·[s. s.], p. 70), there being a strong presumption that supplemental legislation, not in necessary conflict, does not repeal by implication the prior statutes, and since the Supreme Court had held prior to said act of 1875 that the act of 1873 gave such companies no legal rights in such funds until such appropriation. p. 191.

17. SAME.—*In Pari Materia.*—*Construction.*—*Railroads.*—*Subsidies.*—The act of 1877 (Acts 1877, p. 111), providing for the appropriation of money by townships in aid of the building of railroads, when construed with the act of 1875 (Acts 1875 [s. s.], p. 70) and the act of 1869 (Acts 1869 [s. s.], p. 92), such statutes being *in pari materia*, does not give a railroad company any legal right to money voted, levied and collected for its aid but not appropriated therefor by the board of commissioners. p. 193.

18. CONSTITUTIONAL LAW.—*Statutes.*—*Title.*—Under the constitutional provision (Art. 4, §19) requiring the subject-matter of a statute to be expressed in the title, the title may be examined to ascertain the legislative intent. p. 195.

19. STATUTES.—*Affecting Public Rights.*—*Construction.*—Statutes granting rights affecting the public, or creating private burdens for *quasi*-public purposes, are construed strictly in favor of the public. p. 195.

20. CONSTITUTIONAL LAW.—*Statutes.*—*Title.*—The title "An act extending the time for the completion of railroads," etc., to which aid has been or shall be voted, does not embrace, within the requirements of Art. 4, §19 of the Constitution, provisions in such statute for the collection of subsidies, by railroad companies, from townships through which such roads have been or may be built. p. 196.

State, *ex rel., v.* Board, etc.—166 Ind. 162.

21.  CONSTITUTIONAL LAW. — *Statutes.—Title.—Construction.*—
Where the title to an act is broad enough to comprehend differ-
ent matters which may be the means to the end expressed in
such title, doubts will be solved in favor of upholding the
statute.   p. 197.

22.  SAME. — *Statutes. — Title.—Specific.—Construction.*—Where
the title to a statute is so specific in expression as to be ex-
clusive of all else, only such specific matters may be embodied
in the statute.   p. 198.

23.  SAME. — *Statutes. — Title. — System of Legislation.* — The
system of legislation into which an act is fitted will be consid-
ered in determining the sufficiency of the title to such act.
p. 199.

24.  STATUTES. — *Construction. — Railroads. — Completion.—Time
for.*—The legal effect of the act of 1877 (Acts 1877, p. 111)
was to confirm in certain railroad companies a definite time in
which to complete their roads.   p. 200.

25.  PLEADING.—*Complaint.—Theory.*—Where plaintiff bases his
action upon alleged rights contained in a judgment, he is not
entitled to a recovery if such judgment does not support such
claims.   p. 201.

26.  JUDGMENT.—*Construction.*—In construing the decision and
judgment in a cause, general language must give way to specific,
and ambiguous language must be controlled by that which is
certain.   p. 201.

27.  SAME.—*Dictum.—Recitals.—Construction.—Law of the Case.*
—Statements made in a decision and not within the issues, and
recitals of facts or assumptions of fact in a decision, are not
binding as the law of the case.   p. 202.

28.  SAME.—*Parties.—Who Bound.—Dictum.*—In a proceeding by
certain taxpayers of a township to cancel a railroad subsidy
tax, wherein the assignee of the railroad company was per-
mitted to intervene as the alleged owner of such subsidy, a state-
ment in the decision on appeal that such intervention was not
improper "as it [the intervenor] was the owner of the subject-
matter of the suit," does not adjudicate title to such subsidy as
between such assignee and the township, especially where the
court expressly put aside such question saying that it made no
difference to whom the subsidy should be paid if the township
had to pay it.   p. 202.

29.  SAME.—*Construction.—Law of the Case.—Judicial Notice.—
Briefs.*—In determining the breadth of an ambiguous decision
on appeal, the court may examine the briefs of counsel in such
cause to ascertain the respective claims.   p. 202.

30.  JUDGMENT.—*Law of the Case.—Construction.*—Where two constructions are open as to the import of a prior decision, that is preferred which accords with law and right.   p. 203.

31.  SAME.—*Parties.—Railroads.—Subsidies.*—In a proceeding by taxpayers of a township to ·cancel a railroad subsidy tax, wherein the assignee of the railroad company intervened as the alleged owner of such subsidy, a decision against plaintiffs merely "fixing their liability for the tax which they were seeking to avoid," is not binding for any purpose on the board of commissioners, and does not determine as to such board the title to such subsidy, nor that such board should appropriate such tax when collected to the payment of such subsidy.   p. 203.

32.  SAME. — *Law of the Case.—Construction.—Election.*—The decision, on appeal, of a suit by taxpayers of a township to cancel a railroad subsidy tax, wherein the assignee of the railroad company intervened as the alleged owner of such subsidy, is the law of the case on a subsequent appeal by such intervenor in an action to mandate the board of commissioners to collect such tax, but such intervenor can not demand the application of the favorable parts of such decision without yielding to the unfavorable parts.   p. 204.

33.  MANDAMUS. — *Railroads.—Subsidies.—Taxation.*—A railroad company has no legal right under the act of 1869 (Acts 1869 [s. s.], p. 92) as supplemented by the acts of 1873 (Acts 1873, p. 184) and 1875 (Acts 1875, p. 121, §5369 Burns 1901) and as amended by the act of 1875 (Acts 1875 [s. s.], p. 70) and supplemented by the act of 1877 (Acts 1877, p. 111) to mandate the board of commissioners to levy a subsidy tax voted by a township.   p. 205.

34.  ESTOPPEL.—*In Pais.—Judgment.—Contentions of Parties.— Subsequent . Contradictory Contentions.*—Where an intervenor on a prior appeal contended that neither the board of commissioners nor the township was interested in the suit by taxpayers of the township to cancel a railroad subsidy tax to which intervenor claimed title, such intervenor can not afterward contend that the decision it obtained on such representations concludes such board and such township from contesting intervenor's right to such subsidy.   p. 206.

35.  SAME.—*Election.—Acquiescence in Judgment.—Representations in Securing.*—Where a party acquiesces in a judgment he elects to consider it as binding, and can not afterward repudiate it, especially where, by his contentions and conduct, he has secured the rendition of such judgment.   p. 208.

From Clinton Circuit Court; *Joseph M. Rabb,* Special Judge.

Action by the State of Indiana, on the relation of the Western Construction Company, against the Board of Commissioners of the County of Clinton. From a judgment for defendant, plaintiff appeals. *Affirmed.*

*F. Winter, W. R. Moore* and *A. W. Hatch,* for appellant.

*Martin A. Morrison* and *Gavin & Davis,* for appellee.

GILLETT, C. J.—This is an action by way of mandate, instituted by the Western Construction Company as relator, to compel the Board of Commissioners of the County of Clinton to enter an order requiring the treasurer of said county to collect a certain railway aid tax, which had been levied against Center township, in said county, in the year 1878, and which had been afterwards suspended, pursuant to the provisions of §5369 Burns 1901, §4069 R. S. 1881. In one form or another, the subject-matter of this controversy, or some phase of it, has been before this court four times prior to the taking of the present appeal. See *Barner* v. *Bayless* (1893), 134 Ind. 600; *McKinney* v. *Frankfort, etc., R. Co.* (1895), 140 Ind. 95; *State, ex rel.,* v. *Burgett* (1898), 151 Ind. 94; *State, ex rel.,* v. *Board, etc.* (1904), 162 Ind. 580. In the present case the court sustained a demurrer to the petition and alternative writ, and from the final judgment which followed, relator appeals. In its averments of facts the writ follows the petition, so we need only consider the averments of the petition, and we shall only attempt to state what seems to be the material averments of that pleading.

It appears that a petition in the ordinary form was filed with said board, asking that said township make an appropriation of $20,000 to aid the Frankfort & State Line Railroad Company. The board ordered an election, and the notice thereof stated that it was to be held to take the

votes of the legal voters of said township upon the proposition to aid in the construction of said railroad "by donating money to said company to the amount of $20,000, as provided by an act to amend the first, second, third, fourth, thirteenth and seventeenth sections of an act" approved May 12, 1869, and acts amendatory thereto. The election resulted in favor of the proposition, and, after taking the proper intermediate steps, the board, at its June session, 1878, levied a special tax of ninety-four one-hundredths of one per cent on the real and personal property of said township. The tax was placed on the duplicate, but the auditor and treasurer suspended the collection thereof, as provided by §5369, *supra.* It further appears that in June, 1886, David P. Barner and more than twenty-five other taxpayers of said township filed a petition with the board of commissioners to cancel said tax, as provided by said section. Publication was duly had, and, pursuant thereto, one Bayless appeared before the board and filed a petition setting up facts to the effect that said railroad company had performed the statutory conditions, and charging' therein that it was the duty of the board to order said tax collected. Both Bayless and the railroad company filed an answer, by way of denial to the petition, and the petitioners filed an answer in denial to the petition of Bayless. Upon a trial the board of commissioners ordered the tax canceled. Bayless and the railroad company appealed, and the proceeding ultimately reached the White Circuit Court. While the proceeding was pending on appeal, the relator herein filed in said cause its intervening petition, alleging, among other things, "that it had become and was the owner by assignment to it by said Frankfort & State Line Railroad Company of all the latter's right, title and interest in and to said aid and tax," and demanded, as between said Frankfort & State Line Railroad Company and said Western Construction Company, that said Western Construction Company be adjudged the owner of said tax, aid and dona-

tion, and entitled to the money derived therefrom." It is further alleged in the relator's petition that said cause was tried on its merits upon said pleadings in the White Circuit Court; that it then and there became a material question as between the parties whether the railroad company had within the time allowed by law expended in the actual construction of its road in said township an amount of money equal to the appropriation, and also whether prior to said time said railroad had transferred its right, title and interest in and to said appropriation to the Western Construction Company. It is alleged that said court rendered final judgment in said cause, whereby it adjudged that said railroad company, by expending in the construction of its line of railroad in said township a sum of money in excess of $20,000, had earned said sum of $20,000 local aid voted by the taxpayers of said township; that the intervening petitioner, the Western Construction Company, acquired by assignment the right and interest of said railroad company in said aid; that the board of commissioners entered an order upon its records requiring that said tax be immediately collected by the treasurer of said county, as though the same had never been suspended; that the order of said board suspending the tax was void; that the auditor of said county place upon his duplicate said voted aid "of $20,000, together with the proper penalty thereon, and interest thereon, from June 31, 1881, until collected;" that the treasurer at once proceed, as in the case of delinquent taxes, to collect said aid to $20,000, together with said penalty and interest from June 31, 1881, and that the treasurer, when the same is collected, shall immediately pay the same to the clerk of the White Circuit Court for the use and benefit of the Western Construction Company, its assignees or successors. It is further alleged in the petition herein that the petitioners, Barner and others, appealed to this court, and that on issues duly joined said judgment of the White Circuit Court was affirmed. Then follows the

opinion of this court, as the same appears in *Barner* v. *Bayless, supra.* For the sake of clearness, we deem it proper to quote the following portion of said opinion: "Many of the questions discussed by counsel, in their briefs, when applied to this case, are of no importance whatever. The Board of Commissioners of the County of Clinton was not a party to the cross-complaint of Bayless, nor was the county auditor or county treasurer such party. They were not parties to this suit in any sense. It is plain, therefore, that any order the court may have made in this case, in relation to the collection of the tax in controversy, was a mere nullity, for the reason that no party was before the court upon whom such an order could operate. Such order could not affect the appellants, because they had no power to execute it; nor were any orders made by the court affecting them, beyond fixing their liability for the tax which they were seeking to avoid. Nor does the order of the court directing that the tax, when collected, be paid over to the appellee, the Western Construction Company, in any manner affect the appellants. If they are compelled to pay the tax in controversy, it is immaterial to them whether it is paid over to the railroad company or to the construction company which performed the labor of constructing the railroad. Stripped of these immaterial matters, we reach the controlling question in the case, and that is the question as to whether the railroad company had expended, in Center township, in the actual construction of its road, a sum equal to the donation voted by the township. This was the question for trial before the circuit court. As a question of fact, it was hotly contested, and the evidence relating to it was conflicting. The court hearing the evidence reached the conclusion that the company had expended, in the actual construction of its road in Center township, a sum largely in excess of the amount of the donation in controversy. With this conclusion, we have neither the power nor the inclination to interfere. It is

claimed, however, by the appellants, that during the progress of the cause the court below committed many errors which prevented them from having a fair trial. It is claimed, first, that the court erred in permitting the Western Construction Company to intervene and become a party to the suit. It would seem to be a sufficient answer to this claim to say that the Western Construction Company was permitted to become an intervenor in this case without objection or exception. Had such objection been made, as it was the owner of the subject-matter of this suit, we see no impropriety in permitting it to appear and take such steps as would protect its interests. Such seems to be the recognized practice." The relator in this case also pleads the proceedings and judgment in certain contempt proceedings which had their origin in the refusal of the members of the board and auditor and treasurer to obey the requirements of said judgment. Said officers were adjudged guilty of contempt, and upon appealing to this court the judgment was reversed. Finally, it is alleged in said petition that in September, 1904, relator filed a certified copy of said proceedings in the case of *Barner* v. *Bayless, supra,* with the board of commissioners, and demanded performance, which was refused.

Relator grounds its demand for a reversal upon the claim that it is entitled to the appropriation under the statutes, upon the judgment of the White Circuit Court in the cause last mentioned, and upon the proposition that the decision of this court in *Barner* v. *Bayless, supra,* settled, as the law of the case, relator's ownership of the subject-matter of the suit, by its declaration upon that point, and by its judgment of affirmance.

It does not admit of doubt that in a case of this kind, where the very opinion and judgment of this court is pleaded as an adjudication, we are at liberty to

1. look to the entire record for the purpose of determining what was adjudicated. *Denney* v. *State,*

*ex rel.* (1896), 144 Ind. 503, 31 L. R. A. 726; *Washington, etc., R. Co.* v. *Coeur d' Alene R., etc., Co.* (1895), 160 U. S. 101, 16 Sup. Ct. 239, 40 L. Ed. 355; *Cluggish* v. *Koons* (1896), 15 Ind. App. 599; *Hancock* v. *Diamond Plate Glass Co.* (1906), 37 Ind. App. 351; *Poole, Gilliam & Co.* v. *Seney* (1886), 70 Iowa 275, 24 N. W. 520, 30 N. W. 634; *Dowson* v. *Dowson* (1888), 29 Mo. App. 521; *Dewey* v. *St. Albans Trust Co.* (1887), 60 Vt. 1, 12 Atl. 224, 6 Am. St. 84. There is an especial reason in this case for an examination of the record, and that is that certain utterances of the court in the opinion pleaded are ambiguous. Especially in such a case as this do we assert the right and duty of the court to examine the whole record, that we may know the precise posture of the case and interpret the language of the opinion in the light of the surrounding facts. As we are thus called on to resort to the record, it must be with whatever result may follow from that examination, for it is an ancient rule of pleading that "that which is apparent to the court, and appears from a necessary implication in the record, need not be averred." 7 Bacon's Abr., 459; *Dewey* v. *St. Albans Trust Co., supra; Sheehan, etc., Transportation Co.* v. *Sims* (1889), 36 Mo. App. 224. It is settled that a party can not depart from a record under which he claims or upon which he relies. *Lowry* v. *Erwin* (1843), 6 Rob. (La.) 192, 39 Am. Dec. 556.

An examination of the record of *Barner* v. *Bayless, supra,* reveals the following facts: The White Circuit Court had stated in ten conclusions of law (special findings having been required) the various elements that went to make up said judgment and which, therefore, we need not repeat. It was assigned as a ground for a new trial that the assessment of the amount of recovery was erroneous, being too high. It was also assigned as grounds for a new trial that each of the special findings of the court were contrary to the evidence and that they were not sustained by

sufficient evidence.   An exception was reserved to the over-
ruling of the motion.   The petitioners moved in arrest of
judgment upon the complaint of interpleader of the West-
ern Construction Company, which motion was overruled,
and exception taken.   Among other assignments of error
of the appellants in said cause were the following:   (1)
That the complaint by way of bill of interpleader of the
Western Construction Company does not state facts suffi-
cient to constitute a cause of action; (4) that the court had
no jurisdiction of the subject-matter of the action of the
Western Construction Company; (12) that the court erred
in overruling appellants' motion for a new trial; (13) that
the court erred in overruling appellants' motion in arrest
of judgment; (14) that the court had not jurisdiction of the
persons of the appellants in the action of the bill of inter-
pleader of the Western Construction Company.   The briefs
of the appellants in said cause are not on file.   There re-
mains on file, however, two briefs, filed on behalf of appel-
lees in said action—the brief of George R. Eldridge, filed
August 31, 1892, and the additional brief of J. A. Sims,
filed October 24, 1892.   The brief of Mr. Eldridge indi-
cates that several pages of argument were devoted by
appellants in said action to the bill of complaint or
interpleader of the Western Construction Company; that
the appellants were contending that the court had no juris-
diction of the subject-matter of said petition; that there
could be no ownership of the donation by the railroad com-
pany or by any one else; and that the board of commis-
sioners was entitled to take stock for the appropriation.
Under subdivision G of the brief of Mr. Eldridge it appears
that the appellants' counsel were contending that much of
the court's finding was not sustained by the evidence or was
contrary to the evidence or outside of the issues.   Under
this subdivision Mr. Eldridge says:   "We will examine a
few of the objections pointed out.   It is claimed that the
finding that the appropriation was a donation was erroneous.

As we have shown, it was a donation, and the court was right in so finding. But, even if otherwise, the appellants can gain nothing by questioning it; they are not interested. According to their own argument, it is wholly immaterial what the finding is as to this, as to any one except the board of commissioners, and they are not parties here and are not bound by the finding. If legally they are entitled to take stock, and have not waived their right, they may demand it notwithstanding the finding here made. Appellants should confine themselves to treating their own injuries, not those of others."

On page 22 of his brief, Mr. Eldridge says: "Again, it is claimed that the amount of the recovery is erroneous, being too high; that only $20,000 without interest or penalty could in any way be collected. The question does not arise upon this motion [motion for a new trial], and the error, if any, invades no right of the appellants. The board of commissioners is not a party, nor is the auditor or the treasurer, and can not be bound in this action. If unlawful, the penalty and interest need not be paid; that is a question for debate later." From the brief of Mr. Sims we take the following: "The only issue in this case in which the appellants can have any possible interest is the one we have suggested, viz.: Has the railroad company expended an amount of money equal to said appropriation in the construction of its road in said township? This was the controlling issue, and its determination by the court disposed of all questions in which the appellants could have any possible interest. The residue of said judgment amounted simply to an adjudication of the conflicting rights of the defendants between themselves. There was no averment in the petition that would authorize the court to determine who was the owner of said appropriation. The question could only arise upon some issue presented by the defendants or some of them. The judgment of the court that

the appellants were entitled to no relief and that the taxes must be paid was a full adjudication of all matters set forth in their complaint. Their complaint does not aver that they had any interest, equitable or otherwise, in said tax, after its collection. If there was any question as to the ownership of said tax, it would, as we have said, have to be presented by some pleading on the part of the defendants, or some of them. This we think the Western Construction Company has done, and had the right to do under §568 R. S. 1881, which we quote in full: 'Judgment may be given for or against one or more of several plaintiffs and for or against one or more of several defendants; and it may, when the justice of the case requires it, determine the ultimate rights of the parties on each side as between themselves.' For this reason we insist that the errors complained of are immaterial."

One of the preliminary questions raised by counsel for appellee is whether the alternative writ was insufficient because of its command to the defendant that it enter an order that the tax which had been placed on the tax duplicate for 1878 and afterwards suspended should be collected. A careful study of the statute and the authorities under it has satisfied us that it was this tax which was primarily liable to be applied upon the appropriation, assuming that it is to be collected. See *Board, etc., v. State, ex rel.* (1882), 86 Ind. 8; *Pittsburgh, etc., R. Co. v. Harden* (1894), 137 Ind. 486; *Miles v. Ray* (1885), 100 Ind. 166.

We shall first consider the contention that under the act of May 12, 1869 (Acts 1869 [s. s.], p. 92), and the several acts amendatory and supplemental thereto, relator, as the assignee of the railroad company, became entitled to said appropriation, and, therefore, that it is a proper relator herein. In arguing this case, relator's counsel seek to enforce a distinction between money donations and stock sub-

scriptions as respects the time when the rights of the railroad company attach, and with this point in especial view we shall discuss the legislation. The statutes in question have had a remarkable history—a history that throws a flood of light upon the question immediately in hand, and that leaves no doubt upon the proposition that the railroad company had no enforceable right under such statutes.

At the time the original proceedings were had, the act of 1869, *supra,* was in force as to some of its provisions. Sections 1, 2, 3, 4, 8, 13 and 17, however, had been amended by the act of March 17, 1875 (Acts 1875 [s. s.], p. 70). The later act did not change the prior statute in any matter important to mention here, aside from the fact that it confined its provisions to townships, instead of to counties and townships; in fact, with this exception, the general framework of said original sections and of those amendatory thereof may be said to be the same. An act supplemental to the act of 1869 was passed January 30, 1873 (Acts 1873, p. 184). The second section of this act is the same as the act of March 11, 1875 (Acts 1875, p. 121, §5369 Burns 1901), except that the act of 1875 authorized an application to cancel the tax when the railroad had not complied with the statutory conditions within five years, instead of within three years, as provided by the act of 1873. There was also in force at the time in question the act of March 7, 1877 (Acts 1877, p. 111, §5394 Burns 1901). The section of the original act which is the keystone of the arch of the legislative plan of railway aid is section seventeen of the act of 1869, *supra.* It is as follows: "After the money authorized by this act to be appropriated shall have been levied and collected as aforesaid, and the subscription shall have been made on behalf of the county or township, as the case may be, the railroad company, for whose aid the same shall have been so levied and collected, having fully constructed the railroad contemplated in said petition, so that trains of cars shall pass over the same,

shall have the right to demand and have said money paid over according to the intent and meaning of this act; and any one of said petitioners, or any taxpayer of the county or township, as the case may be, may compel the same to be done by mandate against the county commissioners." Note the language: "After the money authorized by this act to be appropriated shall have been levied and collected, and the subscription shall have been made," the company, after complying with certain conditions, shall have the right to demand and have said money paid over "according to the intent and meaning of this act; and any one of said petitioners, or any taxpayer of the county or township * * * may compel the same to be done by mandate against the county commissioners."

The act of 1869, *supra,* is entitled: "An act to authorize aid to the construction of railroads by counties and townships taking stock in, and making donations to railroad companies." These two methods of aiding railroads, by taking stock or donating money, are recognized all through this system of laws, but the generic word, most frequently used, is "appropriation." It is plain, in practically every instance where this word is made use of, that it is designed to cover both the taking of stock and the making of donations. See Acts 1875 (s. s.), p. 70, §§1, 2, 3, 6, 7, and Acts 1869 (s. s.), p. 92, §§6, 12, 14, 16, 19. In addition to the provision of section seventeen of the act of 1869, which postpones the rights of railroad companies until after the "appropriation" has been levied and collected, it is to be noted that it is required by said section that the "subscription" shall have been made. The latter word is probably used in the sense of a making of a formal written promise. The sense in which words are used frequently changes in legislative enactments, and the immediate context is first to be considered. *Cheney* v. *State* (1905), 165 Ind. 121; Potter's Dwarris, Statutes, 230. But the application of section

seventeen to donations can not be escaped, because it is plain that to look only to the other sections of the act would be to leave the railroad company absolutely without any provision which it could point to as indicative of its right. Section fourteen of the act of 1869, *supra,* is very important. It is as follows:

"Said board of commissioners may, after the assessment herein provided for, or any part thereof, shall have been collected, take stock in such railroad company, from time to time, in the name of the proper county or township, as the case may be, and pay therefor, when the same is taken, out of the moneys so collected as aforesaid, or they may donate such moneys to said company for the purpose of aiding in the construction of such railroad, and pay the same over, from time to time, as the work progresses, as hereinafter provided." The permissive language of this section is to be noted, and it is also to be observed that it appears therefrom that the rights of the company under said section depend as entirely upon the board of commissioners' making the donation, in case of a donation, as they would upon the making of a subscription in the event that the board decided to subscribe for stock. According to said section, it is only "after" money has been "collected" on the assessment that the board may use it for either of such purposes, and sections sixteen and seventeen provide for conditions which must exist as respects the construction of the railroad before the board can act under section fourteen. It will also be perceived that no provision was made for the undoing of any act done in the premises, except where the conditions specified in section eighteen of the act of 1869, *supra,* existed, or pursuant to the supplemental act of 1873 as amended by the act of March 11, 1875 (Acts 1875, p. 121, §5369 Burns 1901).

So far as the act of 1869, *supra,* as amended by the act of March 17, 1875 (Acts 1875 [s. s.], p. 70), is concerned, we think it may fairly be said that to

prevent the taking of any backward step upon the part of the board (in the absence of a forfeiture), and to prevent the company from having any right in the appropriation, a situation was provided for as between the township and the company which amounted to a deadlock (if the board refused to make the subscription or donation), unless—and this was the open sesame to the securing of the appropriation—some petitioner or taxpayer of the township saw fit to invoke the remedy of mandamus, as provided by section seventeen. All of this tends to contradict the view that any right might attach before the board of commissioners took action under section fourteen.

Viewed largely as a matter of original interpretation the matter appears thus, so far as the act of 1869, *supra,* as amended by the act of March 17, 1875 (Acts 1875 [s. s.], p. 70), is concerned, but when these enactments are considered in the light of their history, it is absolutely clear that the railroad company can not sue. The effect of the supplemental act of March 11, 1875 (Acts 1875, p. 121), and the act of March 7, 1877 (Acts 1877, p. 111), we shall discuss later.

Proceeding to subject the act of 1869, *supra,* and the act of March 17, 1875, *supra,* to construction—that is, bringing to bear upon them the pertinent extrinsic facts 9. which throw light upon the legislative purpose—the first fact which is to be considered is the existence of §6 of article 10 of the Constitution of Indiana. That section is as follows: "No county shall subscribe for stock in any incorporated company, unless the same be paid for at the time of such subscription, nor shall any county loan its credit to any incorporated company, nor borrow money for the purpose of taking stock in any such company; nor shall the General Assembly ever, on behalf of the State, assume the debts of any county, city, town, or township, nor of any corporation whatever." It is but fair to assume that the General Assembly did not intend to contravene the

fundamental law in the enactment of the statute of 1869, and as the same language was used with reference to townships as to counties, and as it is clear that if any right upon the part of the railroad company attached prior to a county's paying for stock, the act would to that extent have been unconstitutional, the question arises whether the statute was not built with a view of holding out to the railroad company a reasonable prospect of getting the appropriation, and yet of postponing its right thereto until the Constitution could be complied with. The possibility of doing this was probably suggested by the case of *Aspinwall* v. *Board, etc.* (1859), 22 How. 364, 16 L. Ed. 296. In that case the facts were that in 1849 a majority of the qualified voters of Daviess county, Indiana, had, pursuant to statute, voted in favor of a proposition to subscribe for stock in a railroad company, and to issue bonds to pay therefor. Before the subscription was actually made, the Constitution of 1851 took effect, and the question arose as to whether the vote of the people upon the proposition gave the company such a right to the subscription as would be protected by the Constitution of the United States against the Constitution of Indiana. The court said: "A subscription was necessary to create a contract binding upon the county, on one side, to take the stock and pay in the bonds; and upon the other, to transfer the stock, and receive the bonds for the same. Until the subscription is made, the contract is unexecuted, and obligatory upon neither party."

That the act of 1869, *supra,* would receive the interpretation that was intended, and be upheld against the claim that it had violated the Constitution, was verified when the case of *LaFayette, etc., R. Co.* v. *Geiger* (1870), 34 Ind. 185, was decided. In that case the court said at page 219: "Now it is plain from the above-quoted provision [section fourteen] that this act was not intended to bind a county for a dollar until the money shall be in the treasury from the special tax levied to pay for the

stock, and no subscription was authorized to be made until that time." In *Board, etc.,* v. *Louisville, etc., R. Co.* (1872), 39 Ind. 192, the railroad company sought to mandate the board to levy a tax pursuant to an appropriation which had been voted to the company. It was held that at that stage the company had no interest. The court said: "All of the acts of the commissioners and the voters of the county, in taking steps to raise the money, are between themselves, one the principal and the other the agent; there is no contract with the company, nor has she any right in, or control over, the matter, until the money is raised, and the stock taken. Till that time, the principal and agent alone have control of the proceedings. One or more of the voters might maintain a mandate against the commissioners, because he or they would have a legal interest in it; but the company can not maintain such suit, because she has no legal interest to enforce, no contract ever having been made with her." Of section seventeen of the above act, the court said: "Here it will be seen that any petitioner or taxpayer may have a mandate. Why? Because they have a legal interest in the matter, but the company can not prosecute a mandate, because she has no such interest, and under the rule of construction, that the expression of one excludes all others, she is excluded. It is expressed as to who may have a mandate, and this expression excludes all others."

In *Sankey* v. *Terre Haute, etc., R. Co.* (1873), 42 Ind. 402, the action was by way of mandate by the railroad company and one Jackson, a contractor, who claimed to have constructed the road under an agreement assigning to him certain appropriations made by a number of townships in Vigo county. The complaint or petition alleged that petitions had been filed for such appropriations (not specifying whether it was by way of donation or stock subscription); that the vote in said townships had in each instance been in favor of the appropriation; that the board had granted the prayer of the petitions, and ordered a levy of

the taxes; that the board had not prior to June 30, 1873, nor thereafter, taken stock in said company or made a donation of the appropriations, so voted or any part thereof, and that the treasurer refused to collect the tax. The latter made return, among other things, that he had suspended the tax pursuant to the act of January 30, 1873 (Acts 1873, p. 184). The opinion in this court was written by Osborn, C. J., and it was therein held, on the authority of *LaFayette, etc., R. Co.* v. *Geiger, supra,* and *Board, etc.,* v. *Louisville, etc., R. Co., supra,* that the company had no interest in the appropriations; that the contract of assignment conferred no legal right in Jackson, and that the act of January 30, 1873, *supra,* was not unconstitutional as divesting any vested rights of the appellees.

In *Petty* v. *Myers* (1874), 49 Ind. 1, it appears that a petition for an appropriation had received a favorable vote, and the board had ordered a tax levied, which had been placed on the duplicate. The question as to the constitutionality of the act of 1869, *supra,* as applied to townships, was raised, but the court said that the provision of §6 of article 10 of the Constitution, "if held applicable to townships, has not been violated in this instance, as here it was intended to raise the money before the subscription or donation should be made." It was further said: "By the terms of the statute, it is not required that the mode of making the appropriation, whether by subscription or donation, shall be submitted to vote. The mode is to be determined upon afterwards." The importance of this statement will be perceived, when it is considered that the court looked upon section fourteen of the act of 1869 as fixing the time when the rights of the railroad company might attach—that is, when the board, after the collection of all or some part of the assessment, used the amount to buy stock or make a money donation, and acted on that determination. The court also said in the above case, in answering the objection of the taxpayers who were seeking to enjoin the tax,

that the company had undertaken to release some taxpayers, in consideration of their having voluntarily paid the previous tax assessed in the township on a vote to furnish aid, and that "the railroad company had no legal right to the money or control over it, the stock not being subscribed for, nor the money paid to them by way of donation." Citing *Board, etc., v. Louisville, etc., R. Co., supra; Sankey v. Terre Haute, etc., R. Co., supra.* As will be observed, the case we have just been considering intimated a doubt as to whether the above-mentioned constitutional provision applies to townships. Perhaps it does not. It may be too, as contended by counsel for relator, that an engagement to make a donation is not a loan of credit within said provision. This case does not call for the expression of our views upon either of these subjects. But we do not think that we are unwarranted in assuming that the whole framework of the act of 1869 (Acts 1869 [s. s.], p. 92), as amended by the act of March 17, 1875 (Acts 1875 [s. s.], p. 70), was contrived with a view to avoid any such constitutional objection, and the cases of *Jarrolt v. Moberly* (1880), 103 U. S. 580, 26 L. Ed. 492, and *Harshman v. Bates County* (1875), 92 U. S. 569, 23 L. Ed. 747, suggest that there was some reason to apprehend that this court might hold that the assuming of an engagement by a township to make a donation, done in advance of the raising of the money, was within the prohibition of the Constitution.

We have now considered all of the Indiana cases bearing upon the construction of the act of 1869, *supra,* which had been decided prior to the passage of the act of March 17, 1875, *supra.* We shall in a subsequent portion of this opinion consider the effect of such decisions upon the construction of said act, but for the present we shall give attention to the further authorities which bear upon the construction of both acts. The following cases may be cited as supporting the view which had previously obtained as to the want of interest in the railroad company. *Jager* v.

*Doherty* (1878), 61 Ind. 528; *Bittinger* v. *Bell* (1879), 65 Ind. 445; *Hilton* v. *Mason* (1883), 92 Ind. 157; *Board, etc.*, v. *State, ex rel.* (1888), 115 Ind. 64; *State, ex rel.*, v. *Board, etc.* (1904), 162 Ind. 580. The latter case represents the expression of this court concerning the very tax which is here in controversy.

Attention may be called to *Wadsworth* v. *Supervisors* (1880), 102 U. S. 534, 26 L. Ed. 221, as a case of importance, where the aid was but a donation. The facts were these: In 1864 the legislature of Wisconsin passed an act authorizing the voters of Eau Claire and St. Croix counties to vote a railroad aid to a certain company. The act provided that if a majority of the ballots cast in the county was in favor of the aid, the board of supervisors should have authority to issue bonds to a certain amount. The act contemplated that the bonds should be held by the board of supervisors for the time being, but it was authorized to deliver them to the company when satisfied that their proceeds would be expended in grading and for ties within the county. November 5, 1867, the county of Eau Claire voted an aid to said company under said statute. The road was constructed prior to March 10, 1870, but it did not appear when the work of construction commenced. On or prior to March 15, 1870, the company demanded that the board issue bonds, which it refused to do. March 25, 1872, said act of 1864 was repealed. September 1, 1875, the company assigned its claim to the plaintiff Wadsworth, who sought by mandate to compel the execution of said bonds. The court construed the act of 1864 as nonimperative in its terms, but it added: "If we should be mistaken in this construction of the statute—if the statute had, in terms, made it the duty of the supervisors to issue bonds, to the extent indicated by the popular vote—we should feel bound upon the authority of *Aspinwall* v. *Board, etc.* [1859], 22 How. 364, 16 L. Ed. 296, to hold that the legislature could, at any time before the bonds were in fact issued, or before the

county came under a legal obligation to issue them, repeal, as it did, the statute conferring the power to issue, and thereby withdraw from the supervisors all authority in the premises. The election at which the people gave their sanction to railroad aid had, as we have seen, no other effect than to confer power upon the supervisors to issue bonds, and did not place them under any legal obligation to the railroad company to exercise the power granted. The railroad company had not, prior to the passage of the act of 1872, acquired any perfect or vested right to the donation. The repealing statute of 1864 was, under the circumstances, a total abrogation or obliteration of the law repealed, as much so as if the latter had never existed." See, also, *Town of Concord* v. *Portsmouth Sav. Bank* (1875), 2 Otto 625, 23 L. Ed. 628; *Union Pac. R. Co.* v. *Board, etc.* (1870), 6 Kan. 256; *Chicago, etc., R. Co.* v. *Board, etc.* (1888), 38 Kan. 597, 16 Pac. 828; *Wagner* v. *Meety* (1878), 69 Mo. 150; *People, ex rel.,* v. *Board, etc.* (1874), 2 Colo. 360; 1 Dillon, Mun. Corp., §539; 1 Rorer, Railroads, p. 126.

The case of *Board, etc.,* v. *State, ex rel.* (1888), 115 Ind. 64, explains some of the cases cited by relator's counsel, which held that upon consolidation the consolidated company succeeds to the rights of the original company. Of these decisions it was said: "These were cases where the railway companies to which the aid had been voted had been consolidated with other railway companies, and rest upon principles and rules of law and statutes peculiar to such cases."

A consolidation differs from a mere succession, and, so far as the past is concerned, a consolidated corporation may usually be regarded as the same as its constituents, their existence continuing in it under the new form and name. *Indianapolis, etc., R. Co.* v. *Jones* (1868), 29 Ind. 465; Taylor, Priv. Corp. (4th ed.), §419 *et seq.;* 1 Thompson, Corporations, §365.

The case of *Board, etc., v. Center Tp.* (1886), 105 Ind. 422, is not a precedent which affords relator any support. The question which is now before us was not there involved. At the outset of that opinion it is declared that the court confines itself to the points made by counsel in support of and against the conclusions of law of the trial court. Moreover, the judge who wrote that case said of it, in *Board, etc., v. State, ex rel., supra,* that it was not questioned by counsel upon either side of the case that the amount had been properly donated to the railway company. In the later case the court harked back to the law declared in *Board, etc., v. Louisville, etc., R. Co.* (1872), 39 Ind. 192; *Sankey v. Terre Haute, etc., R. Co.* (1873), 42 Ind. 402; *Petty v. Myers* (1874), 49 Ind. 1; *Jager v. Doherty, supra;* and *Bittinger v. Bell, supra;* and it further said of the provisions of section fourteen of the act of 1869, *supra,* that the "subscription is to be made by the county board, which, for that purpose, acts as the agent of the township. Until it exercises that power and authority there is no perfected subscription to the stock of the company. It is just as necessary that the board should act in that regard in order to make a perfected subscription to the stock of the railway company, as that it should act upon the petition provided for by the first section of the act, in order that there may be a valid vote by the township." If language is really a vehicle for the expression of thought, it is plain that under section fourteen no right obtains until the board acts thereunder, whether it be to make a stock subscription or a donation.

It is in vain for counsel for relator to contend that the performance by the railroad company of the conditions which the statute makes conditions precedent to the receiving of the money constitutes a contract. It is not to be supposed that the railroad was built for the purpose of selling the stock or obtaining a donation, since it was created and organized for the express purpose

State, *ex rel.*, *v.* Board, etc.—166 Ind. 162.

of building a railroad, and was required to state in the articles the counties into which or through which it was intended to pass, and its length, as near as might be. *Board, etc.*, v. *Louisville, etc., R. Co., supra.*

But the word "donation" in the statutes enforces the structural provisions thereof. We quote the following from *Indiana, etc., R. Co.* v. *City of Attica* (1877), 56 12. Ind. 476, 486, showing this court's approval of certain definitions of said word: "A donation is defined by Bouvier to be 'the act by which the owner of a thing voluntarily transfers the title and possession of the same from himself to another person, without any consideration.' Webster defines a donation to be 'that which is given or bestowed; that which is transfered to another gratuitously, or without a valuable consideration; a gift; a grant.' " The root meaning of the word is to give as a present. The Encyclopædic Dictionary. Crabb's Synonymes thus discriminates between gift, present and donation: "The gift is an act of generosity or condescension; it contributes to the benefit of the receiver; the present is an act of kindness, courtesy, or respect; it contributes to the pleasure of the receiver. * * * The gift is private, and benefits the individual, the donation is public, and serves some general purpose." It is laid down as among the ancient maxims of the law (rendering them in the vernacular), that "A gift is perfected by the possession of the receiver," and "A donation obtains its effect by force of the law." 14 Cyc. Law and Proc., 867, 868. It was held in *Indiana, etc., R. Co.* v. *City of Attica, supra,* that because of the use of the word "donation" in an act to enable cities to aid in the construction of railroads, it was incompetent for the city to annex terms to its appropriation. This case was distinguished, by *Bittinger* v. *Bell* (1879), 65 Ind. 445, where the voters of a township had voted upon a proposition to take stock to the amount of the appropriation, and had stipulated for the construction of a depot. It was held "that the township

may, in making its subscription and in the preliminary proceedings which enable it to make the subscription, prescribe such reasonable conditions as are not in conflict with either the letter or the spirit of the law." It was stated by the court that the "condition above set out was not prohibited by any of the provisions of the statute." It was said in *Brocaw* v. *Board, etc.* (1881), 73 Ind. 543, in response to the proposition that neither the petitioners nor the commissioners had any authority to prescribe terms in violation of the statute: "To this general proposition we unhesitatingly yield assent. While conditions may be imposed, they must be such as the statute does not forbid either by express words or necessary implication. The general grant of power contained in section one can not be construed to confer authority to make terms or conditions which the statute does not authorize." It is a far cry from what is decided in the cases cited to the contention of relator's counsel, for said cases do not give any countenance to the view that the railroad company may sue. Assuming that the taxpayers may vote on the question of donation, it by no means follows that they can change the inherent nature of the transaction from that which the statute intended, namely, an authority conferred by a principal on an agent. That would be a violation of law. But here it will be observed that the proposition embraced in the notice of election was to vote upon the question of donation in accordance with the statutes, so that the railroad company was bound to take notice, under the very form of the proposition, that it could have no lot or parcel in the transaction by an attempted acceptance of a proposition which had never been held out to it.

We shall now consider what effect the decisions which had been rendered by this court prior to the enactment of the act of March 17, 1875, had upon the construction of the act. It is presumed that when the legislature substantially reënacts a statute it does so with

State, *ex rel.*, *v.* Board, etc.—166 Ind. 162.

the knowledge of the interpretation or construction which has been given to the prior statute by the court of last resort in the State. *Anderson* v. *Bell* (1895), 140 Ind. 375, 383, 29 L. R. A. 541, and cases cited; *Hilliker* v. *Citizens St. R. Co.* (1899), 152 Ind. 86; *Board, etc., v. Conner* (1900), 155 Ind. 484; *Spaulding* v. *Mott* (1906), 167 Ind. —; *Fisk* v. *Henarie* (1892), 142 U. S. 459, 467, 12 Sup. Ct. 207, 35 L. Ed. 1080; *Sessions* v. *Romadka* (1892), 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609; *The Devonshire* (1882), 13 Fed. 39; *Crescent Bed Co.* v. *City of New Orleans* (1903), 111 La. 123, 35 South. 484; 2 Lewis's Sutherland, Stat. Constr. (2d ed.), §403. Another rule of statutory construction which should be remembered in this connection, as the act of 1875 (Acts 1875 [s. s.], p. 70) only amended sections 1, 2, 3, 4, 8, 13 and 17, of the original act, is that a statute amending a former act operates as to matters thereafter occurring as if the sections as amended had had their appropriate places in the original enactment. *Walsh* v. *State, ex rel.* (1895), 142 Ind. 357, 33 L. R. A. 392; *Russell* v. *State* (1903), 161 Ind. 481; Endlich, Interp. of Stat., §294. "The effect of an amendment of a section of the law is not to sever it from its relation to other sections of the law, but to give it operation in its new form as if it had been so drawn originally, treating the whole act as a harmonious entirety, with its several sections and parts mutually acting on each other." 1 Lewis's Sutherland, Stat. Constr. (2d ed.), §237. With these rules of construction in mind, it is impossible to resist the conclusion that the act of March 17, 1875, *supra,* built, as it is, upon the same lines as the act of 1869, *supra,* was formed with a purpose that its sections should be fitted into the act of 1869 in their appropriate places, and that the act as amended should be construed as the prior act had been. Besides, it is to be recollected that

section fourteen of the act of 1869, which had been several times construed to prevent the railroad company from acquiring any interest, was left in full force. It is true that the amendatory act related only to townships, while the former statute applied to both counties and townships, but the following pertinent questions might be addressed to him who contends that this affords any basis for a distinction: How did this change the force of the prior holding that an act constructed in the same way had been held to contemplate that the appropriation was a mere delegation of power from the taxpayers to their agent, in which the railroad company had no interest? And why should not the statement in *Board, etc., v. Louisville, etc., R. Co.* (1872), 39 Ind. 192, concerning section seventeen of the act of 1869, *supra,* that the giving of a right of mandate to the petitioners and taxpayers excludes all others, continue to apply to the same language of the act of 1875? And what explanation is there for the fact that the General Assembly still left section fourteen of the act of 1869 in force, when that section had been construed as postponing all right upon the part of the railroad company until the board of commissioners acted under the provisions of said section? And why should the legislature have contrived the same kind of an enactment as applied to townships as the previous enactment which had applied to both counties and townships, if it had not been moved to do so, not alone by the same general end, but also to avoid constitutional perils by piloting its enactment along a channel which had been buoyed by the decisions of this court? And it is also to be recollected that two of the previous decisions were in township cases, and that it had been held in one of these decisions that the question of stock or donation was to be determined afterwards, which could only mean after the money had been collected, in accordance with section fourteen, *supra.* In view of the language of the act of 1869, *supra,* impressed

as it has been by the decisions of this court, in view of the adoption of the act of 1875, *supra,* thereafter in the light of the received construction of the language as found in the prior act, and in view of the uniform denial since of the right of the railroad company to sue whenever the question has been raised, it is plain that the act of 1869, as amended by the act of 1875, can not now receive the construction contended for. We adhere to the former holdings of this court that under said enactments the railroad company can not maintain an action by way of mandate. We can only presume that in the enactment of said statutes it was deemed an adequate security to the railroad company to leave the matter of coercing the levying of the tax and the turning over of the money to the persons who, under section seventeen, were authorized to bring an action. But if for any reason, sufficient to commend itself to those to whom the statute has given the right, there is in a given case a failure to exercise the privilege of enforcing the duty, which exists only as between the taxpayers and their agent, we have only to remind those who complain on behalf of the railroad company or of its assignee that this negligible principle lurked in the very heart of the enactment.

Up to this point we have not deemed it best to interrupt the discussion of the questions involved by a consideration of the provisions of the act of March 11, 1875, (Acts 1875, p. 121, §5369 Burns 1901), and the act of March 7, 1877 (Acts 1877, p. 111, §5394 Burns 1901), under both of which relator's counsel make some claim. We turn our attention first to said act of 1875. Section one of this act, except as to the provision as to the time in which a proceeding to cancel the tax may be brought, is a reënactment of section two of the act of January 30, 1873 (Acts 1873, p. 184), which was, according to its title, supplemental to the act of 1869. The act of 1875 was not intended to confer any right upon the rail-

road company in and to the appropriation, but, having provided for a suspension of the tax until the statutory provisions relative to the railroad company had been complied with, it provided for the making of an order for the collection of the tax upon a compliance with such provisions. Under the fundamental plan of the legislation which the act in question supplements, no right attaches when the money is paid in. It is only at that point that the provisions of sections fourteen and seventeen of the act of 1869 became operative, and they were left wholly undisturbed. The fact that the act is supplemental in character gives rise to an unusually strong presumption against a repeal by implication of any part of the act of 1869 which is not in necessary conflict therewith, and besides, it is to be recollected that six days after the enactment of said amendatory section of the act of 1875 (Acts 1875, p. 121), the General Assembly (Acts 1875 [s. s.], p. 70) substantially reënacted sections 1, 2, 3, 4, 8, 13 and 17 of the act of 1869, thereby showing that the provision of section seventeen relative to a petitioner's or taxpayer's having the right to mandate was not intended to be disturbed. It was properly held in *Board, etc., v. Center Tp.* (1886), 105 Ind. 422, 436, of the act of 1873, of which the act in question is a practical counterpart, that it did not "confer any additional rights upon the railroad company. It abridged those rights by postponing the collection of the tax, and, like section eighteen of the act of 1869, provided for a forfeiture." But the conclusive answer to the claim that said act of 1875 gave any right to the railroad company to sue is found in the fact that with the act of 1873 before it this court held, in *Sankey v. Terre Haute, etc., R. Co.* (1873), 42 Ind. 402, and *Petty v. Myers* (1874), 49 Ind. 1, that the company had no interest, so that it must be presumed that the legislature was advised when it enacted the statute of 1875 that it had been so construed.

We shall next consider the effect of the act of March 7, 1877 (Acts 1877, p. 111, §5394 Burns 1901). The act, omitting the enacting clause, is as follows: "Any railroad company, now organized under the laws of the State of Indiana, to which any township has made or may hereafter make an appropriation of money, to aid such company in constructing a railroad in or through such township, by taking stock in or donating money to such company, shall have five years from the passage of this act in which to complete such railroad for use, and, when so completed such company shall be entitled to such appropriation: Provided, that this act shall not be so construed as to entitle any company to such appropriation, that has failed to commence work upon its road within two years from the levying of the special tax for such purpose." The title of this section is: "An act extending the time for the completion of railroads, in all cases where townships have made or may hereafter make an appropriation of money to aid any railroad company in constructing its road." It is claimed that the words in the act, "and when so completed such company shall be entitled to such appropriation," *ex proprio vigore,* gives the company the right to demand and receive the appropriation, irrespective of any prior statute. It will be observed that section seventeen of the act of 1869 (Acts 1869 [s. s.], p. 92), as it was amended by the act of 1875 (Acts 1875 [s. s.], p. 70, §5356 Burns 1901), provided that, upon a compliance with the conditions, the railroad company "shall have the right to demand and have said money paid over according to the intent and meaning of this act," and yet its right to the money had always been subordinated to the provisions of section fourteen of the act of 1869, and the company had been denied all remedy except through the intervention of a petitioner or a taxpayer. Viewed in the light of the legislation on which the act of 1877, *supra,* is based, it is far from clear that the provision that the company shall be entitled to the appropriation was

designed to create a substantive right in the company. Is there any fair reason for holding that the language relied on in the act of 1877, when construed in connection with the body of laws to which it relates, means any thing more than the language which we have just quoted from section seventeen? The later act relates to future as well as to past appropriations, and therefore it is evident that it has its roots in the very enactment which it is claimed that it modified. The statutes as a whole are not only *in pari materia*, and therefore to be construed together; but, as one is based on the other, we must necessarily look to the prior statute in determining upon the operation of the subsequent provision. Of course, we do not mean to intimate that in such circumstances the later law might not modify the first, but the presumption against a repeal by implication is strong, and is not to be indulged if the enactments can be reconciled on any fair hypothesis. But in such a case as this, where there has been no renovation of the whole subject-matter, but where, on the contrary, the acts are absolutely interlocked, nothing short of a positive repugnancy will work a repeal by implication. As was said by this court in *Lutz* v. *City of Crawfordsville* (1887), 109 Ind. 466: "If the legislature manifests an intention to create a system for the government of any subject, it is the duty of the court to effectuate that intention by such a construction as will make the system consistent in all its parts, and uniform in its operation. It would violate all rules of logic, as well as settled principles of law, to dissect the system into parts and assign effect to each part irrespective of its effect upon the uniformity and consistency of the entire system. Statutes are to be construed as part of a uniform system, and such a scheme adopted as will give each part its appropriate place, and not destroy uniformity and harmony by cutting the system into disjointed and incongruous parts."

The title of the act in question states plainly what the legislative purpose was, namely, to extend "the time for the

completion of railroads" to which aid has been or shall be voted. Here is the only distinct statement of the legislative purpose, and under a constitutional provision, such as exists in this State, requiring the subject of the legislation to be expressed in the title (§19, Art. 4), that portion of an act is often the very window through which the legislative intent may be seen. Besides, to give to the words in the body of the act the meaning contended for would be to adopt a literalism concerning them which would overthrow every safeguard of former enactments, save and alone that the railroad must be completed. It is laid down in Vattel's rules, which he applies as well to treaties and statutes as to other compacts, that if "a manifest equity, or a great common utility requires a restriction, we ought to adhere to the most limited sense which the proper signification can admit, even in an affair which appears favorable in its own nature," and that "of two laws or conventions, in all other things equal, we ought to prefer that which is the least general, and which approaches nearest to the affair to which it relates." Potter's Dwarris, Statutes, 131.

The fact must not be forgotten, either, that the act of 1877 purports to extend the time in which railroads in course of construction at the time the act was passed might complete the same. To that extent, the act is in the nature of a grant from the public, and in a sense that is true as to future appropriations. As applied to such a statute the construction ought to be strict in favor of public interests. Indeed, this doctrine involves but little more than the principle of strict construction which applies to statutes creating private burdens for *quasi*-public purposes. *Garrigus* v. *Board, etc.* (1872), 39 Ind. 66; *Miles* v. *Ray* (1885), 100 Ind. 166; *Demaree* v. *Johnson* (1898), 150 Ind. 419; 2 Elliott, Railroads, §831. The case of *United States* v. *Oregon, etc., R. Co.* (1896), 164 U. S. 526, 17 Sup. Ct. 165, 41 L. Ed. 541, is of interest in this

connection. That case arose out of an act of congress donat-. ing lands to a railroad company for the purpose of aiding in the construction of a railroad. The question before the court was as to the duty of the company under the act to construct certain branch lines. As preliminary to a determination of this question, the court said: "The rule of construction applicable to the granting act is the familiar rule that all grants of this description must be construed favorably to the government, and that nothing passes but what is conveyed in clear and explicit language. [Citing cases.] * * * In *Sioux City, etc., R. Co.* v. *United States* [1895], 159 U. S. 349, 360 [16 Sup. Ct. 17, 40 L. Ed. 177], it was said, by Mr. Justice Harlan, speaking for the court: 'If the terms of an act of congress, granting public lands, "admit of different meanings, one of extension and the other of limitation, they must be accepted in a sense favorable to the grantor. And if rights claimed under the government be set up against it, they must be so clearly defined that there can be no question of the purpose of congress to confer them." ' " See, also, *Muncie Nat. Gas Co.* v. *City of Muncie* (1903), 160 Ind. 97, 60 L. R. A. 822; *Indiana R. Co.* v. *Hoffman* (1904), 161 Ind. 593. It is true that one of the reasons for the above doctrine is scarcely applicable to that part of the act which relates to future appropriations, namely, the danger of fraud and imposition practiced on the legislature, yet, as in effect stated above, the very fact that the whole system of laws on this subject is extraordinary, involving, as it does, the power of taxation for a purpose not strictly public, must prompt the court to construe the enactment strictly for the protection of taxpayers.

But there remains a more potent reason for construing said act as indicated by its title, and that is that to construe the act as giving to the company a right to collect the appropriation upon the completion of the railroad would be to bring the act into conflict with

the section of the Constitution above referred to.  As was said by this court in *State, ex rel., v. Commercial Ins. Co.* (1902), 158 Ind. 680, 684:  "When the title of an act is so special or limited as to include one particular only of some general subject over which legislation may be had, then, and under such circumstances, the body of the act must be limited or confined to the particular or special subject expressed in the title, and to matters properly connected therewith, and the act can not deal with other particulars of such general subject."  Here there is no general subject, such as railroads, or railroad aid, which is stated in the title.  The title is:  "An act extending the time for the completion of railroads," etc.  The title is concrete to the last degree.  It indicates on its face just what cases it applies to and what cases it does not apply to.  Nor is the subject of the railroad company's being entitled to enforce the appropriation a matter properly connected with the title, within the meaning of the Constitution.  As was said by Worden, J., in *State v. Bowers* (1860), 14 Ind. 195, 197, where a provision was sought to be upheld on the ground that it might properly be connected with the subject expressed in the title:  "The position assumed would virtually destroy the constitutional restriction.  It would permit, under a title specifying a given subject, the enactment of laws generally, upon all subjects that might be properly legislated upon in connection with the subject specified.  This was evidently not the intention of the framers of the Constitution.  The language employed, 'matters properly connected therewith,' is not to be construed as meaning 'matters that may with propriety be connected therewith.' "

Where the title relates to a subject which is broad enough to make it possible to comprehend different matters, which might or might not be included in the subject as means to a given end, the disposition of the courts is to solve doubtful questions as to the relation of a

particular matter to the subject in favor of the legislation. Thus an act entitled, "An act authorizing the formation of new counties," has been held sufficiently broad to authorize the establishment of courts therein, as a part of the internal furnishings. *Brandon* v. *State* (1861), 16 Ind. 197.  So an act having for its title, "An act providing for the incorporation of railroad companies," has been held broad enough to cover a provision for stockholders' liability. *Shipley* v. *City of Terre Haute* (1881), 74 Ind. 297.  In an Illinois case it was held that an act having for its title, "An act to incorporate the Northwestern University," was sufficient to render valid a section prohibiting the sale of intoxicating liquors.   *O'Leary* v. *County of Cook* (1862), 28 Ill. 534.  But a wholly narrow title, one which explicitly states its whole purpose, can really have no "matter properly connected" with its subject.  Every title which is so explicit as to make what is therein expressed exclude all else, according to the rule that the expression of one thing excludes all others, so that the title is not at all calculated to advise as to the matter which might reasonably have a place therein, is plainly within the principle of the prohibition.   *Mewherter* v. *Price* (1858), 11 Ind. 199; *State* v. *Young* (1874), 47 Ind. 150; *Gray* v. *State, ex rel.* (1880), 72 Ind. 567.  It was said in *Henderson* v. *London, etc., Ins. Co.* (1893), 135 Ind. 23, 20 L. R. A. 827, 41 Am. St. 410, that the title of a legislative act "should be more than a mere warning to the reader, that unless he shall read the act and learn if his interests are involved his property may be affected by it. Ordronaux, Constitutional Legislation, p. 590, states that 'titles should distinctly recite what the particular subject of the law is.'  This may often be done by language quite general, then, again, there are instances which require particularity.  If the subject is composed of two or more essential elements, the expression of one of such elements in the title would not suffice.  The absence of one of such elements

in the title would be as misleading, and might be as pernicious, as the evils sought to be obstructed by the Constitution." It was held in the case from which we have just quoted that an act which was, in substance, entitled, "An act to create a firemen's pension fund," did not authorize legislation which provided for the accumulation of such a fund by levying a tax on the net receipts of fire insurance companies. If that case was correctly decided, it must plainly follow that the title of the act in question is insufficient to warrant such a construction of the enactment as is contended for by relator's counsel, for there might be a relation between the creation of a firemen's pension fund and a provision for a levying of taxes therefor, while in the act before us the title does not suggest that the company is to be entitled to the money upon the completion of the railroad.

The sufficiency of the title in such a case as this must be judged in the light of the existing system of legislation into which the act is fitted, and where, as here, the system had sharply differentiated between the time which must elapse before a petition to cancel the tax could be filed, and as to the circumstances in which the company could receive the appropriation, and as to the manner of the enforcement of the privilege, it must needs follow that an act which has a title indicative of the fact that its design is to prevent a cancelation of the tax within a certain period of time would be calculated to deceive, if it were held that the act gave an absolute right in the company, to the breaking down of all prior restrictions. As pointed out by Judge Cooley, and his language is quoted approvingly in *Henderson* v. *London, etc., Ins. Co., supra,* one of the purposes of such a constitutional provision as the one with which we are dealing is fairly to "apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity

of being heard thereon, by petition or otherwise, if they shall so desire." Cooley, Const. Lim. (6th ed.), 172. Regarding this as one of the purposes of the ordaining of such constitutional provision, it follows that a masking of a purpose to give railroad companies an absolute right to appropriations voted to them as soon as the railroad is completed, under an act entitled, "An act to extend the time for the completion of such railroads," would be nothing less than a shameless fraud upon the people of the State. It is difficult to find apposite precedents upon the question in hand, but the case of Leach v. People, ex rel. (1887), 122 Ill. 120, 12 N. E. 726, may be regarded as considerably in point. That case involved the validity of an act entitled, "An act to change the time of electing certain officers in a county therein named." The body of the act, in addition to changing the time of election, provided for a change in the composition of the board of supervisors in such county. The constitution of Illinois provided that no private or local law "shall embrace more than one subject, and that shall be expressed in the title." Passing on the validity of the act, the court said: "To change the time of electing certain officers signified that particular merely—the change of the time of election—and did not at all embrace the main object of the law. The title was deceptive and misleading, giving no intimation of the more important purposes of the act. Without disregard of this constitutional requirement, we do not see that we can do otherwise than to hold this act to be violative thereof, and therefore void." It is our opinion that the effect of the act of 1877 (Acts 1877, p. 111, §5394 Burns 1901) was to confirm in the railroad companies to which it applied the right to a definite period for construction, a right which was impliedly recognized by the act of March 11, 1875 (Acts 1875, p. 121, §5369 Burns 1901), thereby clearly limiting the operation of section eighteen of the original

act.  See *Board, etc., v. Center Tp.* (1886), 105 Ind. 422; *Nixon v. Campbell* (1886), 106 Ind. 47.

Our conclusion is that so far as the statutes are concerned relator has no interest in the appropriation as against the township.  In a sense, the construction of the statutes was unnecessary; for, as relator does not show by averment that the railroad company has complied with the statutory conditions, but rests its claim upon what was adjudicated in *Barner v. Bayless* (1893), 134 Ind. 600, it is evident that if said judgment, as construed by this court, did not give to relator an enforceable right, then, so far as this action is concerned, relator is without right.  We have deemed it proper, however, to consider whether there was any right in relator under the statutes, because, as we shall hereafter show, this consideration is material as respects the position of relator concerning said judgment.

Since the decision in *Barner v. Bayless, supra,* this court has held that the holding that the board of commissioners was not bound by the judgment of the White Circuit Court, because it was not a party to the proceeding, was erroneous.  *State, ex rel., v. Burgett* (1898), 151 Ind. 94; *State v. Board, etc.* (1904), 162 Ind. 580. We must, however, take the situation as we find it, and the question now is as to the effect of the judgment of the White Circuit Court with the declarations of this court on appeal impressed on it as the law of the case.  And first we have to observe that in construing the opinion of this court, and the judgment of affirmance which followed it, that which is general must give way to that which is specific, and that which is ambiguous must give way to that which is certain. It is also to be remembered that the judgment which was affirmed was the judgment of the White Circuit Court as interpreted by this court.

Counsel for relator claim that the following declaration in said opinion determines, as the law of the case, relator's

ownership of said appropriation: "Had such objection been made, as it [relator] was the owner of the subject-matter of the suit, we see no impropriety in permitting it to appear and take such steps as would protect its interests." This expression was cast into the form of a dictum, and it is questionable whether we ought to put such a declaration on the high plane of a declaration of the law of the case, but, passing this over, it is apparent that it can not be successfully asserted that this court was holding that relator was the owner of the appropriation as between it and the township. It is to be remembered that what the court said in this connection had nothing to do with the sufficiency of relator's intervening petition, or as to its right to an affirmative judgment thereon, but solely as to whether the action of the court in admitting it as a party to the suit prevented the appellants from having a fair trial. We should not be prepared to say at this time that there would have been error in admitting relator as a party for the purpose of resisting an application to cancel. Such a course was not calculated to prejudice the petitioners. Again, as bearing on the interpretation of the opinion, the fact is to be noted that prior to the making of this declaration, the court, in dealing with the question growing out of the fact that the judgment directed that the tax, when collected, should be paid to the Western Construction Company, waived the question off, by stating that if the township should be compelled to pay the tax, it would be immaterial whether it was paid to the railroad company or its assignee. There was absolutely no reason for this course, if it was the court's conclusion that relator was the absolute owner of the appropriation. In this connection it is not unimportant to consider, in determining the breadth of the declaration relied on, the argument of Mr. Sims, that the "residue of said judgment amounted simply to an adjudication of the conflict-

ing rights of the defendants between themselves." Even now, as the proceedings of the White Circuit Court are pleaded in the petition before us, the charge is that the demand of said intervenor was that it should be adjudged the owner of said tax "as between said Frankfort & State Line Railroad Company and said Western Construction Company." In the face of all this, we cannot hold that the declaration upon which relator relies settled, as the law of the case, its ownership of the appropriation. We have already seen that such a declaration, construed as relator indicates it should be, was profoundly erroneous, and it is not our duty to follow off into the miasmal marshes of error any further than is necessary in seeking after the declared law of the case. Two constructions being open as to the meaning of the declaration, it is our duty to prefer the one which more nearly accords with law and right. See *Washington, etc., R. Co.* v. *Coeur d' Alene R., etc., Co.* (1895), 160 U. S. 77 and 101, 16 Sup. Ct. 231, 40 L. Ed. 355. It is further to be noted, with regard to the declaration of ownership, that if it is given the construction contended for by counsel for relator, it would bring it into conflict with prior portions of said opinion, for it had plainly been declared, and is now settled as the law of the case, "that any order the court may have made in the case in relation to the collection of the tax in controversy was a mere nullity, for the reason that no party was before the court upon whom such an order could operate." It is also to be noted that the court declared that "such order could not affect appellants, because they had no power to execute it," and that no orders were "made by the court affecting them beyond fixing their liability for the tax which they were seeking to avoid." We have studied said former opinion with great care, and, having done so, it is plain to us that it is self-contradictory unless it is construed on much narrower lines than the relator must, on

principle, contend for here, in order to support the right
which it asserts under the judgment. It may be that, by the
failure to disturb the judgment in favor of relator, it has
become vested with the right, asserted in the manner pro-
vided by statute, which the railroad company might have
had but for its assignment, but what is said in the opinion
concerning the order making the appropriation payable to
relator must be read in connection with the statement that
the board of commissioners—the collecting agent—was not
bound.  The opinion is really built upon the proposition
that the whole matter of coercing payment is open, aside
perhaps from what the opinion terms "fixing their liability
for their tax," because the board of commissioners, which
by law was charged with the duty of collecting the tax and
proceeding thereafter as required by statute, was not a
party to the proceedings.  It having been determined, upon
the former appeal, that the taxpayers could not raise many
of the questions which the opinion states were discussed by
them, because they could not perform, and that the judg-
ment against their agent (who has the power to perform)
was a nullity, what justice would there now be in holding
that the board could not successfully resist the claim of
relator because, as a matter of final right, the existence
and validity of its demand had been settled in a suit
against the original petitioners?

Counsel for relator are right in their contention that
the opinion in the case of *Barner* v. *Bayless* (1893), 134
Ind. 600, is the law of this case.  We held in
*State, ex rel.,* v. *Board, etc.* (1904), 162 Ind. 580,
that the board of commissioners—the mere tribunal
or agency to effectuate a proper result—could not contend
concerning questions which were settled against all of the
taxpayers, and that to the extent that the taxpayers were
concluded the board could not "refight the old battle."  To
that decision we still adhere, and by the same token
we hold that what was determined adversely to relator

upon the former appeal is an essential element as respects the force of the judgment. The principals were before the court in the former litigation, and when relator seeks mandate to enforce that which it contends was secured to it by that litigation, it can no more impeach the ultimate result than could the owner of property derogate from the terms of a deed under which he claimed. Owing to the declarations of this court in said proceeding, there is a line of cleavage through the judgment of the White Circuit Court, and relator must abide that result as a part of the fortunes of litigation. This is really but an application of the doctrine of election, which, as Herman states, "is founded upon the principle that there is an implied condition, that he who accepts a benefit under an instrument must adopt the whole of it, conforming with all its provisions, and renouncing every right inconsistent with them." 2 Herman, Estoppel and Res Judicata, §1028. "When you claim under a deed, you must claim under the whole deed together: you cannot take one clause and desire the court to shut their eyes against the rest." *Wilson* v. *Townshend* (1795), 2 Ves. Jr. 693.

It cannot successfully be contended, as argued, that a writ of mandate should be granted because all interested parties were before the court in the former suit. We cannot create a right where none exists; we cannot conjure an equity out of a statute which is to be strictly construed in favor of the right of private property—a statute which postpones all right in the railroad company until the culminating act of making a donation, and which had been definitely construed before relator sought to make itself the assignee of a claim that it was bound to know that under the law it could not collect. It was said by this court, in *Board, etc.,* v. *Jarnecke* (1905), 164 Ind. 658, 664: "The rule is well settled that where a party seeks to avail himself of a statutory remedy, he must bring himself substantially within the provisions of the act

awarding such remedy. *Harrison* v. *Stanton* [1896], 146 Ind. 366, 370; *Chicago, etc., R. Co.* v. *Barnes* [1905], 164 Ind. 143. In Sutherland, Stat. Constr., §§392, 393, this rule is stated as follows: '392. A statutory remedy or proceeding is confined to the very case provided for and extends to no other. It cannot be enlarged by construction, nor be made available or valid except on the statutory conditions, that is, by strictly following the directions of the act. 393. A party seeking the benefit of such a statute must bring himself strictly not only within the spirit but its letter; he can take nothing by intendment.' " We conclude that, upon the face of the proceedings as they appear in relator's petition, a duty does not exist, in relator's favor, by virtue of said judgment to levy said suspended tax.

There is another point, however, which is sufficient to defeat the present action, and that is that on the former appeal relator, to avoid a reversal, assumed positions which are absolutely contradictory of its present position. It will be observed that on questions as to the sufficiency of the evidence to support the finding, and particularly upon the questions as to whether there was a donation and whether interest and penalty could be collected, Mr. Eldridge stated that the board was not a party and therefore was not bound; that the board might afterwards elect to take stock, notwithstanding the finding, if the right to it had not been waived, and that if the imposition of penalty and interest was unlawful, that could be determined later. The contention of Mr. Sims must not be overlooked in this connection, that there was but one question in the case in which the petitioners could have any possible interest, and that was as to whether "the railroad had expended an amount of money equal to said appropriation in the construction of its road in said township." How does such a position as this, offered as a practical answer to all of the questions raised in the case except as to whether the tax had been earned, accord with

the present position of relator that the determination of the White Circuit Court of relator's ownership of the subject-matter of the suit amounts to an adjudication of right, which leaves it no longer dependent upon the statutes for a remedy?

The so-called intervening petition of the Western Construction Company was a pleading of a nondescript character, but as soon as the White Circuit Court filed its special findings and conclusions of law, it was evident that said court was construing it as a complaint against the township. There was no right to file such a complaint by the railroad company or its assignee; the proceeding was a special one, instituted before a tribunal of limited jurisdiction, and the circuit court on appeal could not with propriety grant any remedy that the board of commissioners was not authorized to grant. It is going quite far enough to hold that a petitioner or taxpayer, in view of the provisions of §5369 Burns 1901, §4069 R. S. 1881, and section seventeen of the act of 1869, as amended by the act of 1875 (Acts 1875 [s. s.], p. 90), may obtain an order, on being summoned into court on a petition to cancel, that the tax be collected, but it certainly was never contemplated that the railroad company or its assignee might at that stage of the proceedings obtain a final judgment on a cross-complaint. Treating the assignment of errors on said appeal as the complaint in this court, and gathering the various propositions argued from the briefs which are on file and from the statements in the opinion of the court, it is difficult to resist the conclusion that the court ought to have reversed the cause, at least as to relator. This being true, and the affirmance having been obtained on the lines of relator's then insistence, it would seem that upon the ordinary principles which govern an estoppel *in pais* relator ought to be held precluded from asserting the conflicting contention that it has a right to mandate to enforce what, according to its construction, would prac-

ically amount, by force of said adjudication, to an ordinary debt against the township.

But we are of opinion that there are other reasons, aside from the doctrine of an estoppel *in pais,* which are sufficient to preclude relator from assuming its present position. "A party who has acquiesced in a judgment cannot sue to annul it, no matter how radical its defects, or absolute its nullity." *Abbot* v. *Wilbur* (1870), 22 La. Ann. 368. And see 2 Herman, Estoppel and Res Judicata, §1061. Here it is evident that relator not only acquiesced in the opinion which this court rendered, but actually procured it. To ease the stress of conflict on the validity of the judgment of the White Circuit Court, relator assumed positions on the former appeal concerning the effect of that judgment that are absolutely antagonistic to its present position, and, having obtained a decision along the lines of its own insistence, it cannot be heard now to contend that the judgment of the White Circuit Court is to stand four square as to all the world. Relator saw fit to stamp a meaning upon said judgment through the force of its own contention, acquiesced in by this court, and the judgment so construed must stand as a judgment procured. This is exemplified by *Jeffers* v. *Jeffers* (1891), 139 Ill. 368, 28 N. E. 913, where it was said: "Complainants, by their own bill and proceedings under it, have established the rights of defendants which they now attempt to defeat. This, clearly, they can not do." See, also, *Kelly* v. *Norwich Fire Ins. Co.* (1891), 82 Iowa 137, 47 N. W. 986.

By taking the positions indicated, and accepting the benefit of a judgment of affirmance based on its own contentions, there was, in effect, an election by relator, from which it is not at liberty to withdraw. 2 Herman, Estoppel and Res Judicata, §1028. Indeed, we think that we can put our claim that relator can not successfully assume its present position on the ground that in this action, which is

in a sense a continuation of the former action, relator is not at liberty to depart from its positions upon which the court saw fit to base its judgment of affirmance. *"Allegans contraria non est audiendus."* In the translation of this maxim of the law, Lord Kenyon said that "a man shall not be permitted to 'blow hot and cold' with reference to the same transaction, or insist, at different times, on the truth of each of two conflicting allegations, according to the promptings of his private interest." Broom's Leg. Max. (8th ed.), 168. It is stated by the American annotators of the *Duchess of Kingston's Case* (1776), Smith's Leading Cases (6th Am. ed.), 764: "That a man must choose between different and inconsistent rights, and can not assert one after he has deliberately elected to enforce the other, is a rule of natural justice which was known to the common law at an early period, and has since been liberalized and enlarged by equity." This principle is especially applicable to positions assumed in prior litigation. Lord Chancellor Loughborough declared, in *Wilson* v. *Townshend, supra:* "You can not act, you can not come forth to a court of justice, claiming in repugnant rights." It was stated by Eustis, C. J., in *Gridley* v. *Conner* (1849), 4 La. Ann. 416, 417: "We understand it to be a rule in the administration of justice, that a man shall not be permitted to deny what he has solemnly acknowledged in a judicial proceeding, nor to shift his position at will to a contradictory one, in relation to the subject-matter of litigation, in order to prostrate and defeat the action of the law upon it." In *Gentry* v. *Barron* (1899), 109 Ga. 172, 34 S. E. 349, the defendant had procured a ruling on a former appeal that the action was prematurely brought, and it was held that he could not afterwards insist that the demand had accrued before in order to render available a pleading of the statute of limitations. It was decided in *Savage* v. *Johnson* (1899), 127 Ala. 401, 28 South. 553, that where a party had procured the dismissal of an appeal by contending, on petition for

rehearing, that the decree was interlocutory, he could not afterwards recover on the theory that the decree was final. The court said: "This position assumed and urged by the appellants in the other appeal must prevail against them here, and it follows that this bill can not be maintained." In an earlier case in the same court it was stated: "A defendant who, for the purpose of maintaining a defense, has deliberately represented a thing in one aspect, can not be permitted to contradict his own representation by giving the same thing another aspect in the same case." *Hodges* v. *Winston* (1891), 95 Ala. 514, 11 South. 200, 36 Am. St. 241. Where it is apparent that, upon a former appeal, a party has led the court to omit to consider the questions sought to be raised as grounds for a reversal of the judgment by deliberately representing it as not precluding the appellant on a certain line of questions, and the court has, in effect, so held, it will not permit such party on a second appeal to take a position in respect to his rights in such judgment which is directly antagonistic to his former representation, and to the theory upon which he induced the court to affirm the case. *Davis* v. *Wakelee* (1895), 156 U. S. 680, 689, 15 Sup. Ct. 555, 39 L. Ed. 578; *Taylor* v. *Crook* (1902), 136 Ala. 354, 34 South. 905, 96 Am. St. 26; *Pepper* v. *Shepherd* (1885), 4 Mackey 269; *Turner* v. *Billagram* (1852), 2 Cal. 520; *Kaehler* v. *Dobberpuhl* (1884), 60 Wis. 256, 18 N. W. 841; *Perkins* v. *Jones* (1883), 62 Iowa 345, 17 N. W. 573; *Jones* v. *Pashby* (1882), 48 Mich. 634, 12 N. W. 884; *Smiley* v. *Cockrell* (1887), 92 Mo. 105, 4 S. W. 443; 16 Cyc. Law and Proc., 796, and cases cited.

We hold that the court below did not error in sustaining the demurrer to the petition and alternative writ. In some particulars our views, as expressed in this case, are in a measure out of accord with the principal opinion in *State, ex rel.*, v. *Board, etc.* (1904), 162 Ind. 580, and to the extent of the conflict that case is disapproved.

Judgment affirmed.